UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 13-71(DSD/JJG)

Hawa Kennedy,

        Plaintiff,

v.                                                      **ORDER**

Heritage of Edina, Inc.,

        Defendant.


    Gerald T. Laurie, Esq. and Laurie & Laurie, P.A.,
Leopold B. Epee, Esq. and Epee Law Firm, LLC, 1660 South
Highway 100, Minneapolis, MN 55416, counsel for
plaintiff.

    Kerri J. Nelson, Esq. and Bassford Remele, PA, 30 South
Sixth Street, Suite 3800, Minneapolis, MN 55402, counsel
for defendant.


    This matter is before the court upon the motion for summary judgment by defendant Heritage of Edina, Inc. (Heritage). Based on a review of the file, record and proceedings herein, and for the following reasons, the court grants the motion in part.


**BACKGROUND**

    This employment dispute arises out of the December 2010 termination of plaintiff Hawa Kennedy by Heritage. Heritage is an assisted living facility owned solely by its Chief Executive Officer, Maria Field. Field Dep. 65:23. Kennedy, a Liberian immigrant, worked for Heritage as a housekeeper. Kennedy Dep. 7:1-24; Kennedy Aff. ¶¶ 1, 7.

Kennedy alleges that, during her time at Heritage, her supervisor, Shayron Rundquist, made several discriminatory comments to her, calling Kennedy a "black bitch" and "nigger" at least two times per month[1] during the course of her employment.  Kennedy Dep. 67:6-13; Kennedy Aff. ¶ 7.  Kennedy also alleges that Rundquist told her that "Africans don't know how to clean."  Kennedy Aff. ¶ 8.  Further, Kennedy alleges that Rundquist required her to lie on the ground and clean underneath tables and refused her eye protection while cleaning ceilings and high walls with chemicals, tasks that were not assigned to other housekeepers.  Kennedy Dep. 51:7-52:21, 53:19-54:24.  Rundquist also gave Kennedy more work than she could complete during her two-hour shifts and often made her repeat tasks.  Id. at 51:19-52:7, 53:8-23.

Kennedy typically did not report such behavior to Heritage. Id. at 60:5-21, 68:7-69:21.  Kennedy did, however, complain informally to Director of Human Resources Bonnie Miller on numerous occasions.  Specifically, Kennedy (1) complained that Rundquist did not let her drink water while working and (2) twice complained that Rundquist made her reclean bathrooms.  Id. at 60:22-64:11.

---

[1] In her affidavit submitted in opposition to this motion, Kennedy states that Rundquist called her "nigger" "no less than two times a month."  Kennedy Aff. ¶ 7.  In her deposition, however, Kennedy stated she was unsure how often Rundquist made such comments.  Kennedy Dep. 68:20-69:4.  At this stage in the proceedings and viewing all evidence and inferences in favor of Kennedy, the court credits the evidence contained in the affidavit regarding the frequency of such comments.

In 2009, Kennedy made several requests to reduce her hours to care for her son, who has sickle-cell anemia. Kennedy Aff. ¶ 14. Heritage granted Kennedy an extended leave of absence following her son's surgery. Kennedy Dep. 45:4-46:24. Thereafter, Kennedy requested reductions in hours on three occasions. Heritage granted each request. Id. at 46:2-50:22; Miller Dep. 90:8-91:25. After the last of these requests, in September 2010, Kennedy was scheduled from 9:00 a.m. to 11:15 a.m. for four days each week. Miller Dep. 91:10-17; Laurie Aff. Ex. 5.

Kennedy alleges that in December 2010, Field called her a "black bitch" and a "bad nigger" and stated that Africans did not know how to clean. Kennedy Dep. 65:7-66:8. Kennedy reported such comments to Miller shortly after they occurred. Id. at 65:7-22. Later that day, Field left a telephone message informing Kennedy that she was terminated. Id. at 72:11-73:14. Thereafter, Kennedy received two termination letters, which stated that Heritage was unable to accommodate her latest scheduling request.[2] Id. at 74:5-75:18. The decision to terminate Kennedy was made jointly by Rundquist, Field, Miller and Melissa Heller. Miller Dep. 30:16-17.

On December 21, 2012, Kennedy filed this action in Minnesota court. Heritage timely removed. On November 14, 2013, Kennedy

---

[2] Both letters were dated December 2, 2010. Laurie Aff. Ex. 3, 4. One letter provided that Kennedy could "reapply in May/June 2011." Laurie Aff. Ex. 4. The other letter excludes this language, but is otherwise identical. Id. Ex. 3.

3

filed an amended complaint, alleging (1) race and national origin discrimination, (2) retaliation and reprisal, (3) disability discrimination, (4) breach of contract and (5) promissory estoppel. Heritage moves for summary judgment.

## DISCUSSION

### I.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 272, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists–or cannot exist–about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

4

If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. <u>Celotex</u>, 477 U.S. at 322-33.

## II.   Race and National Origin Discrimination

Kennedy alleges race and national origin discrimination under Title VII and the Minnesota Human Rights Act (MHRA).[3]  Though the complaint and memoranda are not a model of clarity, Kennedy seems to argue that she can establish discrimination under both disparate treatment and hostile work environment theories.

### A.   Disparate Treatment

Kennedy first argues that she was terminated because of her race and national origin.  A plaintiff in race or national origin action may survive a motion for summary judgment through either direct evidence of discrimination or through the burden-shifting analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973).  Kennedy argues that she has presented direct evidence of discrimination.  Specifically, Kennedy argues that on the day of her termination, Field called her a "black bitch" and "bad nigger" and stated that Africans did not know how to clean.[4]

---

[3] Claims under Title VII and the MHRA are analyzed using the same standard.  See Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011); Clearwater v. Indep. Sch. Dist. No. 166, 231 F.3d 1122, 1124 n.2 (8th Cir. 2000).

[4] Kennedy argues that the history of comments by Rundquist also constitutes direct evidence of discrimination.  Because the court determines that Field's comments are sufficient to establish

(continued...)

"Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." Gallagher v. Magner, 619 F.3d 823, 831 (8th Cir. 2010) (citation and internal quotation marks omitted).  Direct evidence does not include "statements by decisionmakers unrelated to the decisional process itself." Id. (citation omitted).  "Direct refers to the causal strength of the proof, not whether it is circumstantial evidence." Young-Losee v. Graphic Packaging Int'l, Inc., 631 F.3d 909, 912 (8th Cir. 2011) (citation and internal quotation marks omitted).

Here, crediting Kennedy's version of the events, the statements made by Field are direct evidence of discrimination. Field was the CEO of Heritage, and had the authority to fire Kennedy. See Field Dep. 65:23.  Indeed, Field was involved in the decisionmaking process and informed Kennedy of the termination. Kennedy Dep. 72:11-73:14.  Moreover, there is a strong temporal connection between the comments and termination, as both allegedly occurred on the same day.  See Roberts v. Park Nicollet Health Servs., 528 F.3d 1123, 1128 (8th Cir. 2008) (finding direct evidence in a pregnancy discrimination dispute where a "key

---

[4](...continued)
direct evidence of discrimination for purposes of the instant motion, however, it need not reach such argument.

decisionmaker" expressed concerns regarding plaintiff's pregnancy on the day she was terminated).   Further, the statement that Africans do not know how to clean is directly connected to Kennedy's job duties and provides insight into a potential motive for termination.   See Gallagher, 619 F.3d at 831.   As a result, the court finds direct evidence of race and national origin discrimination, and summary judgment is not warranted.

**B.   Hostile Work Environment**

Kennedy next alleges that Heritage maintained a hostile work environment.   Specifically, Kennedy argues that (1) Rundquist called her "nigger" or "black bitch" at least twice a month, (2) Rundquist made her perform dangerous and demeaning work and (3) Field made discriminatory comments on the day that Kennedy was terminated.[5]

An employee experiences a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule,

---

[5] In her affidavit submitted in opposition to this motion, Kennedy states that Field made racial comments to her "almost every time I was sent to clean her office." Kennedy Aff. ¶ 9.  In her deposition, however, Kennedy stated that the only time Field made such comments was on the day of her termination.  Kennedy Dep. 94:23-95:10.  A plaintiff cannot create a genuine issue of material fact by submitting a self-serving affidavit to contradict earlier deposition testimony.  City of St. Joseph, Mo. v. Sw. Bell Telephone, 439 F.3d 468, 476 (8th Cir. 2006) (citation omitted). Moreover, Kennedy does not state that the purpose of her affidavit was to clarify or correct her deposition.  See id. (providing courts should not strike a contradicting affidavit if it states that it is offered to clarify or correct prior testimony).  As a result, the court disregards this portion of the affidavit.

and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted); see Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000). To succeed on a hostile work environment claim, a plaintiff must show that (1) she belongs to a protected group, (2) she was subject to unwelcome harassment, (3) a causal nexus exists between the harassment and the protected group status, (4) the harassment affected a term, condition, or privilege of her employment and (5) the defendant knew or should have known of the harassment and failed to take proper action. Tademe v. St. Cloud State Univ., 328 F.3d 982, 991 (8th Cir. 2003). If one or more of the people creating the hostile environment are supervisors, a plaintiff need not prove the fifth element. See Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). In such a scenario, a defendant can avoid liability if it can establish that it implemented an effective program for reporting and resolving harassment, the program was available to the plaintiff and the plaintiff failed to take advantage of it. See id. at 806-07.

Heritage argues that the alleged racial harassment was not sufficiently severe or pervasive to affect a term, condition or privilege of Kennedy's employment. In deciding whether a plaintiff has demonstrated that the harassment affected a term, condition or

privilege of employment, the court looks at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843 (8th Cir. 2002) (citations omitted). To avoid imposing "a code of workplace civility," the threshold for actionable harm is high. Id. The harassment must be so intimidating, offensive, or hostile that it "poisoned the work environment." Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999) (citations omitted). The "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not alone rise to the level of a Title VII violation. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (citation and internal quotation marks omitted).

Here, however, Kennedy states that she was called "nigger" and "black bitch" twice a month for approximately twenty-seven months. See Kennedy Aff. ¶ 7. Further, Kennedy alleges that Rundquist - the same individual that used such slurs - forced her to perform physically-demeaning work, such as laying on the ground to clean tables. See Kennedy Dep. 51:7-52:21, 53:19-54:24. Such frequency and severity of remarks, as well as physically-humiliating tasks, could - if found to be true - lead a reasonable jury to find that the harassment affected a term, condition or privilege of

employment.  See Green v. Franklin Nat'l Bank of Minneapolis, 459
F.3d 903, 911 (8th Cir. 2006) ("In all, there are eight alleged
instances of co-worker using racially insensitive terms toward
plaintiff in a three-month time frame.  We have found just a few
incidents in a longer time span to be sufficient for a hostile work
environment claim." (citation omitted)).  As a result, Heritage's
argument that the alleged harassment was not severe or pervasive
enough to constitute a hostile work environment is without merit.

Heritage also argues that the Faragher affirmative defense
applies because Kennedy never reported the alleged racial
harassment to anyone at Heritage.  That defense, however, is
unavailable where, as here, the alleged harassment culminated in a
tangible employment action, such as termination.  Brenneman v.
Famous Dave's of Am., 507 F.3d 1139, 1144 (8th Cir. 2007).  Here,
as already explained, a reasonable jury could find that Kennedy was
terminated based on her race and national origin.  As a result,
material fact issues remain as to whether the Faragher defense is
applicable, and summary judgment is not warranted on the hostile
work environment claim.

## C.   Retaliation

Kennedy next argues a claim for retaliation under Title VII
and reprisal under the MHRA.  Specifically, Kennedy argues that she
was terminated for reporting Field's racial comments.  To establish
a prima facie case of retaliation under either statute, Kennedy

must show that (1) she engaged in a statutorily-protected activity, (2) an adverse employment action was taken and (3) there was a causal connection between the protected activity and the adverse employment action.  Wright v. St. Vincent Health Sys., 730 F.3d 732, 737 (8th Cir. 2013).  Moreover, an employee must show that "the desire to retaliate was the but for cause of her termination – that is, that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the [defendant]."  Id. (citation and internal quotation marks omitted).

Kennedy argues that she engaged in protected conduct by reporting Field's alleged racial slurs.  Indeed, statutorily-protected conduct includes opposing any employment practice that is unlawful under Title VII or the MHRA.  See 42 U.S.C. § 2000e-3(a); Minn. Stat. § 363A.15.  Further, Kennedy has sufficiently tied her termination to the report of discrimination, as only a few hours elapsed between Kennedy's complaint and subsequent termination.  Such temporal proximity is sufficient at the prima facie stage to establish a connection between the protected conduct and the adverse employment action.  See Tyler v. Univ. of Ark. Bd. of Trs., 628 F.3d 980, 986 (8th Cir. 2011) (stating that "in cases where the temporary proximity is very close" the plaintiff can "rest on it exclusively").  Moreover, Field was both the subject of the discrimination complaint and one of the decisionmakers who terminated Kennedy.  As a result, Kennedy can demonstrate a

11

connection between the protected activity and her termination, and has made out a prima facie case of retaliation and reprisal.

Heritage responds that it had a legitimate, non-discriminatory reason to terminate Kennedy's employment. Specifically, Heritage argues that it was not possible to find work for Kennedy because of her limited schedule. Such a reason may be legitimate and non-discriminatory. See Bennis v. Minn. Hockey Ventures Grp., LLP, No. 12-341, 2013 WL 3305213, at *13 (D. Minn. June 28, 2013) (finding employer met its burden where, in part, employee "over-utilized" the company's flexible scheduling policies). As a result, the burden shifts to Kennedy to establish pretext.

"To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the employment action was false *and* that discrimination was the real reason." Wilking v. Cnty. of Ramsey, 153 F.3d 869, 874 (8th Cir. 1998) (emphasis in original) (citation and internal quotation marks omitted). Here, Kennedy argues that she can demonstrate pretext based on (1) the timing of the termination and (2) the racial remarks made by decisionmakers. The court agrees.

Despite Heritage's claims of lack of work, Heritage agreed - less than two months before the termination - that Kennedy's reduced schedule was acceptable. See Laurie Aff. Ex. 5. Moreover, Kennedy notes that nobody from Heritage ever met with her to (1) discuss the schedule, (2) tell her that two hours per day was

12

insufficient or (3) suggest an alternative schedule that would have been more amenable to Heritage. See Kennedy Dep. 75:20-25, 76:20-77:15. Such circumstances, coupled with the extremely close temporal proximity between the complaint of discrimination and the termination, suggest a finding of pretext. See Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1113 (8th Cir. 2001) (looking "for [temporal] proximity in conjunction with other evidence" to establish pretext). Finally, Kennedy argues that the history of racial remarks made by Rundquist and Field - two decisionmakers in the termination - are indicative of pretext. The court agrees. See, e.g., Walton v. McDonnell Douglas Corp., 167 F.3d 423, 426-28 (8th Cir. 1999) (distinguishing pretextual remarks from statements that are remote in time, made by non-decisionmakers or unconnected to the employment decisional process). As a result, an issue of material fact remains as to whether the proffered reason for the termination was pretextual, and summary judgment is not warranted.

## III. Disability Discrimination

Kennedy next argues that Heritage unlawfully terminated her in violation of the Americans with Disabilities Act (ADA) and the disability provisions of the MHRA.[6] Specifically, Kennedy argues

---

[6] Other than one exception - which is not relevant here - the ADA and MHRA are analyzed under the same standard. See Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 789 (8th Cir. 2004). Further, the court may look to federal precedent when construing the MHRA. Dovenmuehler v. St. Cloud Hosp., 509 F.3d 435, 439 n.4 (continued...)

that she was discriminated against based on her son's diagnosis of sickle-cell anemia.  The ADA prohibits an employer from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."[7]  42 U.S.C. § 12112(b)(4).  To establish a prima facie case of associational discrimination, a plaintiff must show that (1) she was qualified for the job at the time of the adverse employment action, (2) she was subjected to an adverse employment action, (3) the employer knew that she had a relative or associate with a disability and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.  See Land v. Wash. Cnty., No. 99-1255, 2001 WL 228441, at *3 (D. Minn. Mar. 5, 2001).

Here, Kennedy points to no evidence - such as comments about her son or his diagnosis - indicating that her son's disability was a determining factor behind her termination.  Rather, Kennedy argues that Heritage failed to reasonably accommodate her scheduling requests necessitated by her son's medical needs.  Such

---

[6](...continued)
(8th Cir. 2007).
    [7] The MHRA contains no such provision, and Minnesota courts have never recognized claims for associational discrimination in the disability context.  Here, even if the MHRA recognizes such a claim, it fails on the merits, and summary judgment would be warranted.

a claim is not cognizable, however, as the ADA does not require an employer to provide reasonable accommodations to an employee who is caring for a disabled relative or associate.  See, e.g., Den Hartog v. Wasatch Acad., 129 F.3d 1076, 1085 (10th Cir. 1997) ("[O]nly job applicants or employees, *but not their relatives* or associates, need be reasonably accommodated." (emphasis added)); Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 214 (4th Cir. 1994) (same).  As a result, Kennedy cannot establish a prima facie case of disability discrimination, and summary judgment is warranted.

## IV.  Breach of Contract

Kennedy next alleges a claim for breach of contract based on her termination.  Under Minnesota law, "[a] claim of breach of contract requires proof of three elements: (1) formation of a contact, (2) the performance of conditions precedent by plaintiff, and (3) breach of the contract by the defendant."  Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A., 756 N.W.2d 907, 918 (Minn. Ct. App. 2008) (citations omitted).  "The formation of a contract requires communication of a specific and definite offer, acceptance, and consideration."  Id.  (citation and internal quotation marks omitted).

"The usual employer-employee relationship is terminable at the will of either" the employer or employee.  Cederstrand v. Lutheran Bhd., 117 N.W.2d 213, 221 (Minn. 1992).  To overcome the presumption of at-will employment, an employee "must present

evidence [the employer] made oral or written statements with specific and definite provisions." Lindgren v. Harmon Glass Co., 489 N.W.2d 804, 810 (Minn. Ct. App. 1992). An employee's subjective beliefs about her employment status are irrelevant. Id. Here, Kennedy acknowledges that her employment was at-will, but argues that Heritage altered this status by granting her last scheduling request. Such an argument fails, however, as Kennedy does not point to any conduct or statement by Heritage that indicates an intent to alter her at-will status. Indeed, the document that Kennedy argues creates such a contract - a September 13, 2010 "Payroll/Status Change Form" approving the schedule request - only sets forth the hours Kennedy would work and does not evince any intent to alter the employment relationship. See Laurie Aff. Ex. 5. As a result, Kennedy has not established a clear and definite promise to alter the at-will employment relationship, and summary judgment is warranted on the breach of contract claim.

## V.   Promissory Estoppel

Kennedy next alleges a claim for promissory estoppel. Promissory estoppel "is an equitable doctrine that implies a contract in law where none exists in fact." Martens v. Minn. Mining & Mfg., 616 N.W.2d 732, 746 (Minn. 2002) (citation and internal quotation marks omitted). To prove promissory estoppel, "the plaintiff must show that (1) there was a clear and definite promise, (2) the promisor intended to induce reliance and such

16

reliance occurred, and (3) the promise must be enforced to prevent injustice." Park Nicollet Clinic v. Hamann, 808 N.W.2d 828, 834 (Minn. 2011) (citation omitted). As already explained, however, Kennedy points to no promise or conduct sufficiently clear and definite to establish a promissory estoppel claim. See Fox v. T-H Cont'l Ltd. P'ship, 78 F.3d 409, 414 (8th Cir. 1996) ("An employer's use of the terms permanent employment, life employment, or employment as long as the employee chooses creates only an indefinite general hiring terminable at the will of either party." (citations and internal quotation marks omitted)). As a result, summary judgment is warranted on the promissory estoppel claim.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that Heritage's motion for summary judgment [ECF No. 28] is granted in part, consistent with this order.

Dated: August 4, 2014

s/David S. Doty_____
David S. Doty, Judge
United States District Court